**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Albert Chaffin, | No. CV-22-02034-PHX-DWL (MTM) |
| Plaintiff, | |
| v. | **ORDER** |
| Centurion of Arizona, LLC, et al., | |
| Defendants. | |

This is a civil rights action brought by Albert Chaffin ("Plaintiff"), who is represented by counsel. Plaintiff's claims stem from his time as a prisoner in the Arizona Department of Corrections and Rehabilitation ("ADCRR"). In Count Two of his operative pleading, the First Amended Complaint ("FAC"), Plaintiff asserts a claim under 42 U.S.C. § 1983 for deliberate indifference to medical needs against Defendants Michael Brathwaite and Diane Curd (together, "Defendants").[1] (Doc. 1-3 at 22 ¶¶ 58-64.)

Defendants have now moved for summary judgment on Count Two and the motion is fully briefed. (Docs. 53, 56, 63.) For the reasons that follow, the Court will order Plaintiff to provide supplemental briefing on whether he should be allowed to pursue the theory of liability asserted in his response brief.

…

…

---

[1] Former Defendants Steven Miller and Doe Physician were also named as Defendants in Count Two but they have since been dismissed. (Docs. 26, 29.)

**RELEVANT BACKGROUND**

I.    Factual Chronology

To provide context for the parties' summary judgment arguments, it is necessary to provide a brief overview of Plaintiff's time at the ADCCR. The materials submitted by the parties at summary judgment reveal the following chronology.

In March 2020, Plaintiff entered the custody of the ADCCR. (Doc. 54 ¶ 1; Doc. 57 ¶ 1.) During the admission process, Plaintiff reported that he suffered from back pain, bipolar disorder, and post-traumatic stress disorder and had a history of substance abuse. (Doc. 57 ¶ 22.)

On June 1, 2020, Defendant Brathwaite evaluated Plaintiff for low back pain. (*Id.* ¶ 24.) Defendant Brathwaite ordered an urgent MRI and extended a Special Needs Order ("SNO") for a wheelchair. (*Id.*)

During June and July 2020, Defendant Brathwaite and other medical providers repeatedly saw Plaintiff for complaints related to back pain. (*Id.* ¶¶ 25, 26, 27, 31, 33-38, 41.)

On July 31, 2020, Defendant Curd discontinued the SNO for Plaintiff's wheelchair. (*Id.* ¶ 47.) Around this time, Plaintiff was also given a disciplinary ticket for, and ultimately found guilty of, "false reporting" his need for medical care. (*Id.* ¶¶ 50, 54.)

On August 3, 2020, Plaintiff met with a medical provider to express frustration over having his wheelchair taken away. (*Id.* ¶ 55.)

On August 4, 2020, Plaintiff submitted a Health Needs Request to see a provider and get his wheelchair back. (*Id.* ¶ 57.)

On August 6, 2020, Plaintiff submitted another Health Needs Request for a wheelchair. (*Id.* ¶ 59.)

On August 7, 2020, medical staff saw Plaintiff for a sudden onset of confusion, disorientation, and incoherent speech. (*Id.* ¶ 60.) Although Plaintiff was having symptoms suggestive of a cerebrovascular accident, medical staff assumed Plaintiff had "ingested an

unknown substance" and placed Plaintiff on a security watch in the mental health unit. (*Id.* ¶¶ 61- 62.)

On August 8, 2020, Defendant Brathwaite denied Plaintiff's request to renew the wheelchair SNO. (*Id.* ¶ 63.)

On August 10, 2020, Plaintiff was diagnosed with an acute stroke, but because of the delay accessing the appropriate level of care, Plaintiff was outside the window for certain medical interventions. (*Id.* ¶¶ 64, 65.)

II.     The Parties' Arguments

In their motion, Defendants argue that "Plaintiff's deliberate indifference claim against [them] is focused only on their alleged retaliation of moving Plaintiff to punitive housing, which occurred on August 7, 2020, and not before." (Doc. 53 at 9.) Operating from that premise, Defendants identify various reasons why they are entitled to summary judgment. (*Id.* at 9-10.)

In response, Plaintiff argues that his deliberate indifference claim against Defendants is actually premised on their denial of his requests for a wheelchair: "A reasonable jury could conclude that Defendants Curd and Brathwaite were deliberately indifferent to Plaintiff's serious medical need by denying Plaintiff of the use of a wheelchair that he required to mitigate his chronic pain and degenerative spinal condition." (Doc. 56 at 1.) Later, Plaintiff elaborates: "[A] jury could find that Curd revoked, and Brathwaite failed to reissue, the wheelchair SNO due to their personal animus toward Plaintiff because of his repeated requests for medical care and accommodations for his chronic pain. Defendants' animus toward Plaintiff is evidenced in documents pertaining to Plaintiff's disciplinary charge, which show that a 'physician' was involved in the determination that Plaintiff had falsely reported his need for medical attention. Any delay or interference in an inmate's treatment that was potentially motivated by animus creates a material issue of fact for the jury." (*Id.* at 8-9, citations omitted.)

In reply, Defendants accuse Plaintiff of attempting to pursue a theory of liability that differs from the theory alleged in the FAC. (Doc. 63.) More specifically, Defendants

argue that the deliberate indifference claim asserted in Count Two of the FAC "specifically arises from these Defendants' purported role in retaliating against Plaintiff by moving him to punitive housing (mental health watch) due to presenting with a serious medical need and that this punitive retaliation for seeking medical care violated Plaintiff's constitutional rights." (*Id.* at 2.)  Defendants contend that although Plaintiff now seeks to argue "that the placement in punitive housing is not the only basis for his deliberate indifference claim," "there is not one reference anywhere in the operative complaint about the discontinuation of the SNO for the wheelchair or the confiscating of the wheelchair by anyone, let alone these Defendants, nor that the taking of the wheelchair was done in retaliation and/or is the basis for the lone deliberate indifference claim against these Defendants or the cause of injury." (*Id.* at 2-3.)  According to Defendants, "[a]rguing for the first time in response to a summary judgment motion a basis for a claim that is clearly not even contained in the claim itself cannot be considered as a basis to overcome summary judgment on the actual claim, as framed by Plaintiff." (*Id.* at 3.)

## DISCUSSION

A threshold issue raised by the parties' summary judgment briefing is whether the theory of liability that Plaintiff seeks to advance in his response to Defendants' motion—*i.e.*, Defendants engaged in deliberate indifference by revoking and then refusing to reissue the SNO for his wheelchair—is a new theory of liability not properly raised in the FAC.

The relevant factual allegations in the FAC are as follows.  In March 2020, Plaintiff was assessed with chronic back pain and post-traumatic stress disorder when he was admitted to the ADCRR. (Doc. 1-3 at 19 ¶ 32.)  On July 6, 2020, Plaintiff was assessed with atypical chest pain and, one month later, was found to have essential hypertension. (*Id.* at 19 ¶ 34.)  Plaintiff was then approved for a wheelchair and other assistance for his chronic back pain. (*Id.* at 20 ¶ 36.)  In July 2020, Plaintiff was evaluated for physical therapy and the physical therapist noted that Plaintiff had difficulty walking long distances, with significant spinal findings noted. (*Id.* at 20 ¶ 37.)  On July 29, 2020, Plaintiff was unable to stand for his weight and his blood pressure was high. (*Id.* at 20 ¶ 38.)  On July

30, 2020, radiology findings reflected a concern for an acute fracture. (*Id.* at 20 ¶ 39.) On July 31, 2020, Plaintiff was accused and found guilty of false reporting, but those accusations were in retaliation for Plaintiff seeking medical care and accommodations for back pain and related medical issues. (*Id.* at 20 ¶¶ 40, 44.) Medical records revealed that ADCRR employees talked to a "physician" in support of the disciplinary charge, even though no physician had recently seen or evaluated Plaintiff. (*Id.* at 20 ¶¶ 41-42.) Plaintiff was placed in "punitive detention" following this retaliatory disciplinary ticket. (*Id.* at 20 ¶ 45.) While in punitive detention, Plaintiff suffered a cerebrovascular accident, but his emergent need for medical care was ignored for days until he was finally transferred to Yuma Regional Medical Center, where it was discovered he suffered a stroke. (*Id.* at 20-21 ¶¶ 45-48.) Due to the delay in care, Plaintiff was outside the window for certain interventions and suffered permanent injuries. (*Id.* at 21 ¶ 49-50.)

In Count Two of the FAC, Plaintiff incorporates by reference all of these allegations and then asserts that Defendants "violated [his] constitutional rights . . . by their individual and collective indifference to [his] serious medical needs." (*Id.* at 22 ¶¶ 58-59.) The remaining allegations in Count Two are as follows: "Specifically, acting individually and collectively, these Defendants retaliated against [Plaintiff] for seeking treatment for his serious medical needs. Plaintiff is informed and believes that [Plaintiff] was moved to punitive housing in retaliation for presenting to prison officials with a serious medical need. Punitive retaliation for seeking medical care is a violation of the clearly established constitutional right to seek medical care for serious medical needs. The individual defendants knew, or should have understood, that their acts or failure to act violated [Plaintiff's] constitutional right. As a result of the violations set forth here, Plaintiff . . . suffered serious and permanent injuries requiring ongoing medical care and treatment." (*Id.* at 22 ¶¶ 60-64.)

The Court agrees with Defendants that the claim alleged in the FAC differs from the claim now raised in Plaintiff's response brief. The FAC does not contain *any mention* of Plaintiff's wheelchair being taken away or of the discontinuation of the SNOs related to

Plaintiff's wheelchair. Additionally, Count Two only identifies one specific act that was retaliatory—the "move[] to punitive housing." (*Id.* at 22 ¶ 61.) Defendants are thus correct in interpreting Count Two of the FAC as asserting a "deliberate indifference claim . . . focused only on their alleged retaliation of moving Plaintiff to punitive housing, which occurred on August 7, 2020, and not before." (Doc. 53 at 9.)

Although the analysis could end there, Plaintiff's statements during the course of this litigation confirm that Count Two should be interpreted in this fashion. During discovery, Defendants propounded an interrogatory that required Plaintiff to "[d]escribe in detail every element of your alleged injuries and damages arising out of the incidents and/or treatment (or alleged lack thereof) that are the subject of your operative complaint." (Doc. 54-1 at 7.) Plaintiff responded:

> On August 3, 2020, at approximately 9:12 a.m., Plaintiff was seen for individual counseling with Psych Associate Jamie Babb. Babb assessed Plaintiff's speech as unremarkable. Plaintiff's thoughts were assessed as goal directed, logical, coherent, with no evident psychosis and no gross cognitive deficits apparent. Babb assessed Plaintiff as stable and not in acute distress. Plaintiff was able to complete a written health needs request to make his needs known. On August 4, 2020, at 9:31 a.m., a nursing assistant saw Plaintiff and she was able to complete a treatment order for a blood pressure check. Plaintiff had a telemedicine visit with a mental health mid-level provider at 10:51 a.m. The mid-level found Plaintiff to be in no acute distress with normal speech and unremarkable thought process, thought content, and cognitive functioning.
>
> A nursing assistant was able to complete a treatment order on August 6, 2020, at 8:52 a.m. LPN Rangel documented that Plaintiff was seen that morning for physical therapy without issues. PA Delp entered no new orders and Plaintiff was to return to his housing.
>
> On August 7, 2020, at 1:45 p.m., Plaintiff went to medical for his noon medications. RN Gomez documented that Plaintiff was suffering from altered mental status. Gomez documented that Plaintiff was not oriented to self or place, and that he was confused, disoriented, "sentences are not making sense." She documented that Plaintiff was not responding appropriately to questions. Although Plaintiff's urine drug screen was negative, RN Gomez nonetheless concluded that Plaintiff had ingested some substance.

*Plaintiff's damages began with this nursing encounter and continued through today*. During Plaintiff's encounter with the nurse, Plaintiff suffered confusion and humiliation as his symptoms were ignored and he was falsely accused of taking drugs. Plaintiff knew that something was wrong, but the nurse treated him with contempt. Plaintiff's damages continued through his confinement to a security cell that substantially deprived him of timely and appropriate care. Although Plaintiff was seen by mental health staff, he was not seen by a provider until August 10, 2020, at approximately 3:00 p.m. During his confinement, Plaintiff suffered significant trauma, pain, fear, confusion, and anxiety due in part to the unwarranted harsh conditions of confinement and the uncertainty as to whether he would survive.

Upon his arrival to Yuma Regional Medical Center, Plaintiff was diagnosed with a cerebrovascular accident (CVA), unspecified mechanism and slurred speech. Because of the length of time that had passed since the original CVA, certain treatments were unavailable to Plaintiff. Plaintiff believes that had he been appropriately and timely transported from the prison for care, damage to his brain would have been mitigated.

While at the hospital, Plaintiff suffered with the uncertainty of not knowing how much of his function would return. Plaintiff also suffered frustration at his difficulties in speaking and communicating with the doctors at the hospital.

Imaging showed infarction of the left posterior middle cerebral artery (MCA) distribution described as a moderately large area of infarction without hemorrhage. Providers concluded that Plaintiff was outside the window for TPA. Plaintiff's damages include the additional damage be suffered because of the delay/denial of timely and appropriate care.

Suffering from an ischemic stroke resulted in difficulty speaking and difficulty with the activities of daily living. Having to rely on others to assist him with personal care was embarrassing and contributed to feelings of dependence and helplessness. Deficits in communication because of the stroke exacerbated these feelings.

Plaintiff was referred for skilled physical therapy to improve functional strength, functional mobility, activity tolerance and endurance to assist in safe discharge.

On August 12, 2020, Plaintiff was admitted to Allegiant of Phoenix with speech and language deficits, hyperlipidemia, essential (primary) hypertension, difficulty in walking, sequelae of cerebral infarction, sciatica, muscle weakness, and major depressive disorder. He was discharged September 2, 2020, and returned to the prison where he completed his term

- 7 -

> of incarceration. Upon release from the prison, Plaintiff has sought medical care from the providers listed in response to a previous interrogatory. Plaintiff has seen improvements in his condition, but he has not fully recovered to his pre-stroke status.
>
> Plaintiff has incurred medical bills from various providers. Plaintiff has residual deficits that make it difficult for him to work. Plaintiff notices a decrease in his capacity to remember. He has also noticed that he still has speech deficits. Plaintiff believes that he would be in a very different place had he received timely and reasonable care for his stroke.

(*Id.* at 7-9, emphasis added.) As the highlighted text shows, Plaintiff identified the nursing encounter on August 7, 2020—which is the encounter that led to Plaintiff being placed in punitive mental health housing instead of receiving immediate treatment for his stroke—as the event where his "damages began." This is inconsistent with the position Plaintiff now takes in his summary judgment response, which is that he actually suffered damages on July 31, 2020 when Defendant Curd discontinued his SNO for a wheelchair. In a related vein, although Plaintiff's interrogatory response is 11 paragraphs long and spans several pages, it does not (similar to the FAC) contain any references to the wheelchair-related decisions by Defendants and does not identify those decisions as damage-causing events.

For these reasons, the Court cannot simply turn to the merits of the theory of liability asserted in Plaintiff's response brief. *See, e.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008) ("[T]he Navajo Plaintiffs concede the specific allegations at issue were not included in their complaint. Rather, the Navajo Plaintiffs assert this NEPA claim was adequately presented to the district court because the claim was briefed at summary judgment by all parties and presented at oral argument to the district court. Nevertheless, our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.") (cleaned up). Instead, the rule in the Ninth Circuit is that when, as here, a plaintiff seeks to advance a new claim (which doesn't appear in the complaint) in response to a summary judgment motion, the assertion of that new claim should be treated as a request to amend

the complaint. *Desertrain v. Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Although such amendment requests are ordinarily subject to the liberal requirements of Rule 15, the more stringent standards of Rule 16(b)(4) apply if a scheduling order has issued, it includes a deadline for seeking amendment of the pleadings, and the current request comes after that deadline. *Aguirre v. Ducart*, 2022 WL 3010169, *1 (9th Cir. 2022) ("Aguirre argues that, even if his claim was not properly pled, the district court should have construed his opposition to summary judgment as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time. We disagree. The liberal amendment policy underlying *Desertrain* is not applicable where, as here, a scheduling order prohibits future amendment without a showing of good cause.") (citations omitted); *Thomas v. Toro*, 2023 WL 2671425, * n.6 (D. Haw. 2023) ("In his declaration, Plaintiff references a [new theory of liability] but [that theory] was not included in the SAC . . . . The Court therefore does not address it—nor will it construe this reference as a request to amend the pleadings, where the deadline to do so has passed and Plaintiff proffers no good cause to allow amendment at this time.") (citing *Aguirre*, 2022 WL 3010169 at *1).

Here, a scheduling order issued and set forth an amendment deadline of April 28, 2023. (Doc. 14 at 1.) Although the parties subsequently sought and obtained extensions of certain other deadlines, they never sought an extension of that deadline. (Docs. 15, 16, 18, 19, 21, 22, 30, 31, 35, 36, 46, 47.) To the contrary, the parties acknowledged in later filings that the amendment deadline had expired and was "COMPLETED." (Doc. 35 at 2; Doc. 46 at 2.) Thus, to the extent Plaintiff's response brief should be construed as an amendment request, its filing date of July 15, 2024 (Doc. 56) means it is subject to Rule 16(b)(4)'s "good cause" requirement. *Aguirre*, 2022 WL 3010169 at *1.[2]

It is Plaintiff's burden to establish such good cause. *Johnson v. Cnty. of San Bernardino*, 2021 WL 4810646, *1 (9th Cir. 2021) ("The [amendment request], filed almost a year after the amendment cutoff date set by the district court, was indisputably

---

[2] It is particularly appropriate to apply the rules evenly to both sides here because Plaintiff is not proceeding *pro se*—he has been represented by counsel since the inception of this case.

- 9 -

untimely. Thus, Johnson bore the burden of establishing 'good cause' for his [amendment request's] untimeliness . . . ."). Although Plaintiff did not attempt to make the required showing in his response brief, the Court concludes, in its discretion, that he should be given another opportunity to do so now that the relevant legal standards have been clarified. Accordingly, within 14 days of the issuance of this order, Plaintiff may file a supplemental brief, not to exceed seven pages, addressing whether good cause exists under Rule 16(b)(4) to allow him to pursue the theory of liability advanced in his response brief. In addressing that issue, Plaintiff should bear in mind that "[a] court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under Rule 15. Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. . . . Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted).

Accordingly,

**IT IS ORDERED** that within **14 days** of the issuance of this order, Plaintiff may file a supplemental brief, not to exceed seven pages, addressing whether good cause exists under Rule 16(b)(4) to allow him to pursue the theory of liability advanced in his response brief. No response or reply may be filed.

Dated this 18th day of February, 2025.

Dominic W. Lanza
United States District Judge

- 10 -