**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Albert Chaffin,<br><br>Plaintiff,<br><br>v.<br><br>Centurion of Arizona, LLC, et al.,<br><br>Defendants. | No. CV-22-02034-PHX-DWL (MTM)<br><br>**ORDER** |

Plaintiff Albert Chaffin, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff's claims stem from his time as a prisoner in the Arizona Department of Corrections and Rehabilitation ("ADCRR").

In Count Two of his operative pleading, the First Amended Complaint ("FAC"), Plaintiff asserts a § 1983 claim premised on deliberate indifference to medical needs, in violation of the Eighth Amendment, against Nurse Practitioners Michael Brathwaite and Diane Curd (together, "Defendants"). (Doc. 1-3 at 22 ¶¶ 58-64.) Defendants have now moved for summary judgment on Count Two. (Doc. 53.) For the reasons that follow, the motion is granted.

**DISCUSSION**

I. Count Two

The summary judgment analysis is complicated by the fact that the parties disagree about the nature and scope of Count Two. Defendants argue that Count Two "is focused only on their alleged retaliation of moving Plaintiff to punitive housing, which occurred on

August 7, 2020, and not before," and then identify various reasons why they are entitled to summary judgment on any such claim. (Doc. 53 at 9-10.)

In response, Plaintiff makes no effort to show that Defendants could be held responsible for causing him to be moved to punitive housing on August 7, 2020. (Doc. 56.) Instead, Plaintiff argues that Count Two is actually premised on Defendants' interference with his access to a wheelchair, which occurred on July 31, 2020, and caused him to experience unnecessary pain: "Defendants Curd and Brathwaite are not entitled to summary judgment on Plaintiff's § 1983 deliberate indifference claim because a reasonable jury could find that their revocation and denial of Plaintiff's wheelchair was medically unacceptable and resulted in the 'unnecessary and wanton infliction of pain.'" (*Id.* at 8.) Plaintiff continues: "This unnecessary increase in Plaintiff's pain demonstrates the harm resulting from Defendants' indifference." (*Id.* at 13.) As proof of his unnecessary pain, Plaintiff cites documents dated August 3, 4, and 6, 2020. (*Id.* at 12-13.) Plaintiff also contends that his "uncontrolled pain" was one cause of his subsequent stroke. (*Id.* at 13.)

In reply, Defendants dispute Plaintiff's characterization of Count Two and contend that "[a]rguing for the first time in response to a summary judgment motion a basis for a claim that is clearly not even contained in the claim itself cannot be considered as a basis to overcome summary judgment on the actual claim, as framed by Plaintiff." (Doc. 63 at 3.)

After reviewing the parties' briefing, the Court issued an order in which it agreed with Defendants' interpretation of Count Two but offered Plaintiff an opportunity to provide further briefing on why his claim of wheelchair-access interference should nevertheless be considered part of Count Two. (Doc. 69.) Plaintiff has now filed a responsive brief. (Doc. 70.) As explained below, the Court concludes that Plaintiff cannot premise Count Two on a claim of wheelchair-access interference.

…

…

…

A. **Plaintiff's Earlier Characterizations Of Count Two**

1. The FAC

On October 28, 2022, Plaintiff filed the FAC. (Doc. 1-3 at 16-23.) In the FAC, Plaintiff asserts (1) a state-law negligence claim against Centurion of Arizona, LLC ("Centurion"); (2) an Eighth Amendment-based § 1983 claim, based on deliberate indifference to serious medical needs, against Defendants;[1] and (3) an Eighth Amendment-based *Monell* claim against Centurion. (Doc. 1-3 at 16-23.)

The relevant factual allegations in the FAC are as follows. In March 2020, Plaintiff was assessed with chronic back pain and post-traumatic stress disorder when he was admitted to the ADCRR. (*Id.* at 19 ¶ 32.) On July 6, 2020, Plaintiff was assessed with atypical chest pain and, one month later, was found to have essential hypertension. (*Id.* at 19 ¶ 34.) Plaintiff was then approved for a wheelchair and other assistance for his chronic back pain. (*Id.* at 20 ¶ 36.) In July 2020, Plaintiff was evaluated for physical therapy and the physical therapist noted that Plaintiff had difficulty walking long distances, with significant spinal findings noted. (*Id.* at 20 ¶ 37.) On July 29, 2020, Plaintiff was unable to stand for his weight and his blood pressure was high. (*Id.* at 20 ¶ 38.) On July 30, 2020, radiology findings reflected a concern for an acute fracture. (*Id.* at 20 ¶ 39.) On July 31, 2020, Plaintiff was accused and found guilty of false reporting, but those accusations were in retaliation for Plaintiff seeking medical care and accommodations for back pain and related medical issues. (*Id.* at 20 ¶¶ 40, 44.) Medical records revealed that ADCRR employees talked to a "physician" in support of the disciplinary charge, even though no physician had recently seen or evaluated Plaintiff. (*Id.* at 20 ¶¶ 41-42.) Plaintiff was placed in "punitive detention" following this retaliatory disciplinary ticket. (*Id.* at 20 ¶ 45.) While in punitive detention, Plaintiff suffered a cerebrovascular accident, but his emergent need for medical care was ignored for days until he was finally transferred to Yuma Regional Medical Center, where it was discovered he had suffered a stroke. (*Id.* at 20-21 ¶¶ 45-48.)

---

[1] Hearing Officer Steven M. Miller and "Doe Physician" were also named as Defendants in Count Two but they have since been dismissed. (Docs. 26, 29.)

Due to the delay in care, Plaintiff was outside the window for certain interventions and suffered permanent injuries. (*Id.* at 21 ¶ 49-50.)

In Count Two of the FAC, Plaintiff incorporates by reference all of these allegations and then asserts that Defendants "violated [his] constitutional rights . . . by their individual and collective indifference to [his] serious medical needs." (*Id.* at 22 ¶¶ 58-59.) The remaining allegations in Count Two are as follows:

> Specifically, acting individually and collectively, these Defendants retaliated against [Plaintiff] for seeking treatment for his serious medical needs. Plaintiff is informed and believes that [Plaintiff] was moved to punitive housing in retaliation for presenting to prison officials with a serious medical need. Punitive retaliation for seeking medical care is a violation of the clearly established constitutional right to seek medical care for serious medical needs. The individual defendants knew, or should have understood, that their acts or failure to act violated [Plaintiff's] constitutional right. As a result of the violations set forth here, Plaintiff . . . suffered serious and permanent injuries requiring ongoing medical care and treatment.

(*Id.* at 22 ¶¶ 60-64.)

As this summary shows, the FAC does not contain any mention of the denial of a wheelchair. Additionally, the FAC "[s]pecifically" identifies one, and only one, act by Defendants as providing the foundation for Count Two—causing Plaintiff to be "moved to punitive housing in retaliation for presenting to prison officials with a serious medical need." Finally, the only injury alleged in Count Two is "serious and permanent injuries requiring ongoing medical care and treatment." There is not, in contrast, any allegation that Plaintiff suffered the injury of unnecessary pain associated with being denied access to a wheelchair.

2. <u>The Rule 26(f) Report</u>

On January 13, 2023, the parties filed the Rule 26(f) report. (Doc. 13.) Like the FAC, the Rule 26(f) report contains no mention of wheelchair-access interference. Instead, in the portion of the Rule 26(f) report requiring him to identify his "Statement of the Case (including principal factual and legal disputes in the matter)," Plaintiff again focused only on Defendants' efforts to move him into "punitive detention" and identified his only

injuries as the injuries arising from the lack of timely medical care following his stroke:

> Despite Mr. Chaffin's documented history of back pain confirmed with objective radiological evidence, on July 31, 2020, Mr. Chaffin was accused of 'false reporting' for seeking medical care and accommodations for his back pain and related medical issues. Security documents indicate that one or more ADC employees talked to a physician (named in this action as Doe Physician), in support of the disciplinary charge. Reference to Mr. Chaffin's medical record at the time indicates that Mr. Chaffin had not recently been seen or evaluated by a physician. Mr. Chaffin's only providers were nurse practitioners NP Brathwaite and NP Curd. In prison, mid-level providers often encourage inmates to call them "Doctor," although they do not have that qualification. Plaintiff is informed and believes that the finding of guilt was made in retaliation for Mr. Chaffin being a "problem" inmate because of his multiple medical and mental health conditions. During Mr. Chaffin's punitive detention within the prison, he suffered a cerebrovascular accident (CVA). Because Mr. Chaffin's medical complaints were not being taken seriously, his emergent need for medical care was ignored. Although Mr. Chaffin continued to have signs and symptoms suggestive of a CVA, medical staff initially denied, and then ultimately delayed, his transfer to Yuma Regional Medical Center (YRMC). On or about August 10, 2020, Mr. Chaffin was finally transferred to YRMC for acute care where he was found to have had an acute stroke. Because of the delay accessing the appropriate level of care, Mr. Chaffin was outside the window for TPA or for additional interventions. As a result, Mr. Chaffin suffered injuries, some permanent, requiring ongoing care and treatment.

(*Id.* at 3-4.)

3. <u>The Interrogatory Response</u>

On August 24, 2023, Defendants propounded their first set of interrogatories to Plaintiff. (Doc. 54-1 at 2.) In Interrogatory No. 4, Defendants asked Plaintiff to "[d]escribe in detail every element of your alleged injuries and damages arising out of the incidents and/or treatment (or alleged lack thereof) that are the subject of your operative complaint." (*Id.* at 7.)

On September 25, 2023, Plaintiff responded as follows:

> On August 3, 2020, at approximately 9:12 a.m., Plaintiff was seen for individual counseling with Psych Associate Jamie Babb. Babb assessed Plaintiff's speech as unremarkable. Plaintiff's thoughts were assessed as goal

directed, logical, coherent, with no evident psychosis and no gross cognitive deficits apparent. Babb assessed Plaintiff as stable and not in acute distress. Plaintiff was able to complete a written health needs request to make his needs known. On August 4, 2020, at 9:31 a.m., a nursing assistant saw Plaintiff and she was able to complete a treatment order for a blood pressure check. Plaintiff had a telemedicine visit with a mental health mid-level provider at 10:51 a.m. The mid-level found Plaintiff to be in no acute distress with normal speech and unremarkable thought process, thought content, and cognitive functioning.

A nursing assistant was able to complete a treatment order on August 6, 2020, at 8:52 a.m. LPN Rangel documented that Plaintiff was seen that morning for physical therapy without issues. PA Delp entered no new orders and Plaintiff was to return to his housing.

On August 7, 2020, at 1:45 p.m., Plaintiff went to medical for his noon medications. RN Gomez documented that Plaintiff was suffering from altered mental status. Gomez documented that Plaintiff was not oriented to self or place, and that he was confused, disoriented, "sentences are not making sense." She documented that Plaintiff was not responding appropriately to questions. Although Plaintiff's urine drug screen was negative, RN Gomez nonetheless concluded that Plaintiff had ingested some substance.

***Plaintiff's damages began with this nursing encounter and continued through today***. During Plaintiff's encounter with the nurse, Plaintiff suffered confusion and humiliation as his symptoms were ignored and he was falsely accused of taking drugs. Plaintiff knew that something was wrong, but the nurse treated him with contempt. Plaintiff's damages continued through his confinement to a security cell that substantially deprived him of timely and appropriate care. Although Plaintiff was seen by mental health staff, he was not seen by a provider until August 10, 2020, at approximately 3:00 p.m. During his confinement, Plaintiff suffered significant trauma, pain, fear, confusion, and anxiety due in part to the unwarranted harsh conditions of confinement and the uncertainty as to whether he would survive.

Upon his arrival to Yuma Regional Medical Center, Plaintiff was diagnosed with a cerebrovascular accident (CVA), unspecified mechanism and slurred speech. Because of the length of time that had passed since the original CVA, certain treatments were unavailable to Plaintiff. Plaintiff believes that had he been appropriately and timely transported from the prison for care, damage to bis brain would have been mitigated.

While at the hospital, Plaintiff suffered with the uncertainty of not knowing how much of his function would return. Plaintiff also suffered frustration at

> his difficulties in speaking and communicating with the doctors at the hospital.
>
> Imaging showed infarction of the left posterior middle cerebral artery (MCA) distribution described as a moderately large area of infarction without hemorrhage. Providers concluded that Plaintiff was outside the window for TPA. Plaintiff's damages include the additional damage be suffered because of the delay/denial of timely and appropriate care.
>
> Suffering from an ischemic stroke resulted in difficulty speaking and difficulty with the activities of daily living. Having to rely on others to assist him with personal care was embarrassing and contributed to feelings of dependence and helplessness. Deficits in communication because of the stroke exacerbated these feelings.
>
> Plaintiff was referred for skilled physical therapy to improve functional strength, functional mobility, activity tolerance and endurance to assist in safe discharge.
>
> On August 12, 2020, Plaintiff was admitted to Allegiant of Phoenix with speech and language deficits, hyperlipidemia, essential (primary) hypertension, difficulty in walking, sequelae of cerebral infarction, sciatica, muscle weakness, and major depressive disorder. He was discharged September 2, 2020, and returned to the prison where he completed his term of incarceration. Upon release from the prison, Plaintiff has sought medical care from the providers listed in response to a previous interrogatory. Plaintiff has seen improvements in his condition, but he has not fully recovered to his pre-stroke status.
>
> Plaintiff has incurred medical bills from various providers. Plaintiff has residual deficits that make it difficult for him to work. Plaintiff notices a decrease in his capacity to remember. He has also noticed that he still has speech deficits. Plaintiff believes that he would be in a very different place had he received timely and reasonable care for his stroke.

(*Id.* at 7-9, emphasis added.)

Although this interrogatory response is 11 paragraphs long and spans several pages, it does not (like the FAC and the Rule 26(f) report) contain any references to wheelchair-access interference and does not identify such interference as a damage-causing event. To the contrary, and as the highlighted text shows, Plaintiff identified the nursing encounter on August 7, 2020 as the incident during which his "damages began"—a representation

that is inconsistent with the assertion in Plaintiff's summary judgment response brief that Count Two is premised on the "unnecessary increase in Plaintiff's pain" that he experienced between July 31, 2020 and August 6, 2020, which "demonstrates the harm resulting from Defendants' indifference." (Doc. 56 at 12-13.)

B. **Analysis As To The Scope Of Count Two**

On February 28, 2025, the Court issued an order explaining that it agreed with Defendants' contention in their summary judgment reply brief that "the theory of liability that Plaintiff seeks to advance in his response to Defendants' motion—*i.e.*, Defendants engaged in deliberate indifference by revoking and then refusing to reissue the SNO [special needs order] for his wheelchair—is a new theory of liability not properly raised in the FAC." (Doc. 69 at 4.) However, in the first portion of his supplemental brief filed on March 4, 2025, Plaintiff seems to dispute that determination, arguing that Count Two should be deemed to encompass a wheelchair-access interference claim because Rule 8 only requires a short and plain statement of the claim and does not require the articulation of particular facts or legal theories. (Doc. 70 at 2-3.) Plaintiff further argues that because Count Two broadly complains of deliberate indifference to his medical needs that occurred during July and August 2020, and the challenged acts of wheelchair-access interference occurred during that period, "Defendants were on notice that the punitive measures taken on July 31, 2020, were a basis for Plaintiff's deliberate indifference claim." (*Id.*)

This argument is unavailing. In *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006), the Ninth Circuit addressed a similar situation. There, the plaintiff made a pre-litigation "request[] that the [defendants] construct an access ramp" to their store. *Id.* at 965. When that requested went unheeded, the plaintiff "filed a complaint alleging . . . that the [defendants] violated Title III of the ADA by failing to remove architectural barriers." *Id.* Following the close of discovery, the defendants moved for summary judgment on the ramp theory. *Id.* at 966. "[I]n response to the [defendants'] motion for summary judgment, Pickern raised allegations of accessibility violations unrelated to the ramp . . . [including] cross-slope of sidewalks, emergency fire exits, and emergency

landings." *Id.* The district court declined to consider those allegations on the ground that they "were not contained in the complaint and Pickern had not amended or sought to amend the complaint to include those allegations." *Id.* On appeal, the plaintiff attempted—just as Plaintiff attempts to do here—"to justify these new factual allegations as falling within the original complaint under Rule 8's liberal notice pleading standard." *Id.* at 968. The Ninth Circuit disagreed, holding that because "the complaint gave the [defendants] no notice of the specific factual allegations presented for the first time in Pickern's opposition to summary judgment," "[t]he district court did not err by holding that Pickern failed to provide the [defendants] with adequate notice of these new allegations." *Id.* at 968-69.

The parallels between this case and *Pickern* are apparent. In *Pickern*, where the complaint alleged that the defendants committed an ADA violation and then specifically identified the factual premise for that claim (*i.e.*, the lack of a ramp), the plaintiff was precluded from attempting to identify, in response to the defendants' summary judgment motion, new factual premises for his ADA claim (*i.e.*, cross-slope of sidewalks, emergency fire exits, and emergency landings) that were not alleged in the complaint. This was true even though those new factual premises could potentially qualify as ADA violations. Here, similarly, where the FAC alleged that Defendants engaged in deliberate indifference to serious medical needs and then specifically identified the factual premise for that claim (*i.e.*, causing Plaintiff to be moved to punitive housing on August 7, 2020, which resulted in Plaintiff sustaining "serious and permanent injuries requiring ongoing medical care and treatment"), Plaintiff is precluded from attempting to identify, in his response to Defendants' summary judgment motion, a new factual premise for his deliberate-indifference claim (*i.e.*, the acts of wheelchair-access interference on July 31, 2020, which caused Plaintiff to experience unnecessary pain) not alleged in the FAC.

Also instructive is the Ninth Circuit's decision in *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), which involved a challenge to the use of recycled wastewater to make artificial snow at the Snowbowl ski area. The relevant complaints in *Navajo Nation* asserted claims under the National Environmental Policy Act

of 1969 ("NEPA") premised on four theories: "(1) the Final Environmental Impact Statement ('FEIS') failed to consider a reasonable range of alternatives to the use of recycled wastewater; (2) the FEIS failed to discuss and consider the scientific viewpoint of Dr. Paul Torrence; (3) the FEIS failed adequately to consider the environmental impact of diverting the recycled wastewater from Flagstaff's regional aquifer; and (4) the FEIS failed adequately to consider the social and cultural impacts of the Snowbowl upgrades on the Hopi people." *Id.* at 1079. However, at summary judgment, one set of plaintiffs also argued "that the FEIS failed adequately to consider the risks posed by human ingestion of artificial snow," even though their "complaint did not include this NEPA claim or the factual allegations upon which the claim rests." *Id.* The district court declined to allow the plaintiffs to pursue this claim and the Ninth Circuit affirmed, explaining that "our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Id.* at 1080. Here, similarly, the fact that Plaintiff asserted a deliberate indifference claim in the FAC does not give him license to articulate what is essentially a new claim of deliberate indifference, which differs from the specific claim articulated in the FAC and which is based on facts not alleged in the FAC, in response to a summary judgment motion challenging his articulated claim. *See also Ward v. Clark Cnty.*, 285 F. App'x 412, 412-13 (9th Cir. 2008) (where the plaintiff asserted a retaliation claim in her complaint but the complaint "neither mentioned nor alluded to" a particular episode in which she was "involuntarily transferr[ed] to another department in a different location," the district court "properly found" that she could not premise her retaliation claim on that transfer "for the first time in her opposition to Defendant's motion for summary judgment") (citing *Pickern*, 457 F.3d at 968-69).

C. **Constructive Amendment**

In the alternative, Plaintiff argues that even if his wheelchair-access interference claim falls outside the scope of Count Two as pleaded, Count Two was constructively amended to encompass that claim. (Doc. 70 at 3.) According to Plaintiff, a constructive

amendment occurred here because "Defendants recognized and understood that the revocation and denial of Plaintiff's wheelchair was a significant issue underlying his Eighth Amendment claim. Defendants fully explored this issue during discovery, including in the depositions of Plaintiff, Defendants Curd and Brathwaite, and Plaintiff's expert. When Plaintiff was asked about his understanding of the harm caused by the prison's medical providers, he expressly referenced the revocation of his wheelchair. In addition, Defendants acknowledged that the revocation of the wheelchair was a basis for Plaintiff's Eighth Amendment claim in an email between counsel before Defendants filed their motion for summary judgment, although the email incorrectly stated there was 'no evidence' that Defendants Curd or Brathwaite took away Plaintiff's wheelchair. Thus, Defendants were fully aware that the wheelchair revocation was an issue prior to filing their motion for summary judgment, and they were able to fully address the merits of Plaintiff's claim in their summary judgment briefing." (*Id.* at 3-4, citations omitted.)

These arguments lack merit. Although Plaintiff cites cases recognizing that "the parties may constructively amend the complaint by agreeing, even implicitly, to litigate fully an issue not raised in the original pleadings," *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997), those cases address the possibility of constructive amendment under Rule 15(b)(2), which provides that "[w]hen an issue not raised by the pleadings is *tried* by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." *Id.* (emphasis added). Under Rule 15(b)(2), "[i]mplied consent . . . [is] difficult to establish as it depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial. If they do not, there is no consent and the amendment cannot be allowed." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1493 (3d ed. June 2024 update). Here, Defendants did not allow the case to be tried on an issue not raised in the pleadings—this case is still at the pre-trial stage. *Crawford v. Gould*, 556 F.3d 1162, 1168-69 (9th Cir. 1995) ("While Rule 15 allows liberal amendments to the pleadings, no amendment was made in this case. Rule 15(b) allows a court to revise pleadings to conform to the case as

it actually was litigated at trial. The present case did not go to trial; it was decided on motions for summary judgment. Therefore, the situation which Rule 15(b) addresses simply did not arise in the present case."); *Ward*, 285 F. App'x at 412 ("The case was not tried, so Rule 15(b) is unavailing.").

At any rate, even assuming a constructive amendment is possible at this stage of the case, Defendants did not consent in the manner required for a constructive amendment because they "expressly objected" as soon as Plaintiff attempted to raise his wheelchair-access interference claim in his response to their summary judgment motion. *Compare Dream Games of Ariz., Inc. v. PC Onsite,* 561 F.2d 983, 995 (9th Cir. 2009) ("If Dream Games had intended to assert a theory of secondary liability, it should have done so either in the original or an amended complaint, following proper procedure. Instead, the original complaint failed to provide 'fair notice' to defendants of such liability, and Dream Games failed to amend the complaint under Rule 15(a) to allege that theory. Nor was the issue of secondary liability tried by implied consent. PC Onsite expressly objected to Dream Games's proposed jury instructions regarding secondary liability.") *with Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 584 F.3d 1232, 1235 n.2 (9th Cir. 2009) ("Lone Star first raised its invalid-ordinance claim in its motion for summary judgment. The parties fully argued the merits of the claim, however, and the City did not object to Lone Star's failure to raise the claim in its complaint. 'When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.'") (citation omitted).

Nor did Defendants consent to the introduction of this new claim by participating in depositions in which witnesses were asked questions about wheelchair-related issues. Plaintiff fails to cite any case holding (or even suggesting) that a defendant consents to be subjected to a new, unpleaded claim merely by participating in depositions in which the facts underlying that new, unpleaded claim are discussed. *Cf. Rindlisbacher v. Steinway & Sons Inc.*, 497 F. Supp. 3d 479, 490 (D. Ariz. 2020) (rejecting an "attempt to distinguish *Pickern* by arguing that the facts at issue were disclosed . . . during discovery" and

explaining that "[r]equiring [a defendant] to guess whether facts disclosed during discovery would become the basis of the [plaintiffs'] claims would seriously undermine the 'fair notice' requirement in Rule 8").

Finally, the email exchange between counsel does not qualify as consent or support a claim of constructive amendment. In that exchange, defense counsel asked Plaintiff's counsel to "stipulate to voluntarily dismiss [Defendants] from this case" because "[t]he only count as to them is Count Two . . . [which] is focused on purported retaliation by them as to moving [Plaintiff] to punitive housing" and "[t]here is no evidence that either of these [Defendants] were involved . . . in anything that happened August 7, 2020, or later, which is the date you have confirmed the injuries and damages in this case began." (Doc. 70-5.) Defense counsel further stated, in the course of asserting that Defendants "did not take away [Plaintiff's] wheelchair," that "even if that were a fact issue . . . (we contend there is not), that does not fall within the parameters of the lone claim against them and certainly not within the parameters of causation as to the injuries and damages you have confirmed in discovery." (*Id.*) It is difficult to see how an email specifically objecting to any wheelchair-access interference claim, on the ground that such a claim would fall outside the scope of Count Two, could be construed as consent to expanding Count Two to encompass the objected-to claim.

D. **Motion For Leave To Amend**

Further alternatively, Plaintiff moves to amend Count Two to encompass his wheelchair-access interference claim, arguing that good cause exists because "[d]ue to Plaintiff's good faith belief that his Eighth Amendment claim was properly pled, Plaintiff did not seek leave to amend or to modify the corresponding scheduling order deadline at an earlier point in the litigation." (Doc. 70 at 5.) Plaintiff further contends that parties should be allowed to amend the pleadings "based on information learned through discovery" and that Defendants would not suffer any unfair prejudice from the amendment because they "were aware of this issue and thoroughly explored it during discovery" and "addressed this issue in their summary judgment briefing." (*Id.* at 5-7.)

As noted in the February 18, 2025 order, because the deadline for amending the pleadings set forth in the scheduling order has expired, Plaintiff's amendment request is subject to Rule 16(b)(4)'s "good cause" standard, which "primarily considers the diligence of the party seeking the amendment. . . . Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted).

Plaintiff was not diligent in seeking amendment. Plaintiff was obviously aware, at the time he filed the FAC, of the fact that his wheelchair was taken from him and whether he suffered any pain as a result. Accordingly, this is not a situation where the amendment request is premised on new information that Plaintiff learned during discovery. *See, e.g., In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) (citing, with approval, the district court's observation that "[t]he good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action"); *Agricola Baja Best, S. De. R.L. de C.V. v. Harris Moran Seed Co.*, 2013 WL 4499118, *2 (S.D. Cal. 2013) ("The record here does not reflect reasonable diligence and therefore Plaintiff fails to establish good cause. Plaintiff received [the information at issue] well before the inception of this lawsuit, *i.e.*, years before the scheduling order's deadline. Thus, Plaintiff knew, or should have known, of the facts underlying the proposed amendments well before the scheduling order deadline to amend.") (citation omitted).[2]

[2] Additionally, even assuming Plaintiff did not learn, until engaging in discovery, that Defendants were the individuals responsible for interfering with his access to a wheelchair, he did not timely move to amend after discovering that information. Fact discovery closed on January 26, 2024 (Doc. 31) and Plaintiff filed his supplemental memorandum containing the amendment request more than a year later, on March 4, 2025 (Doc. 70). "Courts have held that waiting two months after discovering new facts to bring a motion to amend does not constitute diligence under Rule 16." *Sako v. Wells Fargo Bank, Nat'l Ass'n*, 2015 WL 5022326, *2 (S.D. Cal. 2015). *See also Experexchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, *29 (N.D. Cal. 2009) ("Plaintiff . . . waited two months after discovering its allegedly 'new' facts to bring its motion to amend, filing the motion only after Defendants' Summary Judgment was fully briefed. . . . Because the Court finds that

Plaintiff also contends that good cause exists because he held a "good faith belief that his Eighth Amendment claim was properly pled." The Court respectfully disagrees that this belief qualifies as good cause. For all of the reasons stated in earlier portions of this order, it should have been clear to Plaintiff (based on *Pickern*, *Navajo Nation*, and basic notions of fair notice) that he could not pursue a claim of deliberate difference that differed from the claim specifically articulated in his complaint and was based on facts not alleged in his complaint. It also should have been clear to Plaintiff that a constructive amendment did not occur simply because some of those facts happened to be mentioned during depositions. It is unfortunate that Plaintiff may have misunderstood those principles, but such a misunderstanding, even if reached in good faith, does not provide the sort of good cause required under Rule 16(b)(4). *See, e.g.*, *Double J Investment, LLC v. Automation Control and Info. Sys. Corp.*, 2014 WL 12729163, *1 (D. Ariz. 2014) ("The more stringent standards for amendment under Rule 16 apply since the Scheduling Order governs amendments to the pleadings. Good cause is shown only when the party seeking modification demonstrates that the pretrial schedule was not met despite the diligence of that party. This standard cannot possibly be met where, as here, a party's misunderstanding of the procedural rules is the only reason for missing a scheduling deadline.") (citing *Johnson*, 975 F.2d at 609); *Chancellor v. Pottsgrove School Dist.*, 501 F. Supp. 2d 695, 701-02 (E.D. Pa. 2007) ("[A]ttorney error, which might constitute 'excusable neglect' under Rule 6(b), is insufficient to constitute 'good cause' under Rule 16(b).") (citing *Johnson*, 975 F.2d at 609). And because Plaintiff was not diligent, his amendment request must be denied even assuming it would otherwise not be unfairly prejudicial to Defendants. *Johnson*, 975 F.2d at 609 ("Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, . . . [i]f that party was not diligent, the inquiry should end.").[3]

---

Plaintiff has not acted diligently, it denied Plaintiff's request to amend.")

[3] The Court also notes that Centurion did not move for summary judgment on Plaintiff's claims in Counts One and Three of the FAC, so the outcome here does not preclude Plaintiff from seeking relief in this action.

II. Merits

A. **Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

…

…

B. **Analysis**

As noted, Defendants contend that Plaintiff's claim against them "is focused only on their alleged retaliation of moving Plaintiff to punitive housing, which occurred on August 7, 2020, and not before" and argue that "[t]here is no evidence that these Defendants were involved in those actions." (Doc. 53 at 9.) Under *Celotex*, this was sufficient to shift the burden of production to Plaintiff as to the move-to-punitive-housing claim. *See, e.g.*, *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case.") (internal quotation marks and citations omitted); 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56 (2024) ("[A]ll courts agree—and this was the critical point of *Celotex*—that the moving party's only burden is to address the existing proof record and in some measure identify some hole in that proof. The moving party need go no further, and in particular is not obligated to submit new proof showing that there is nothing missing that could fill that hole.").

In response, Plaintiff makes no effort to show that Defendants were involved in his move to punitive housing on August 7, 2020—instead, he contends that Defendants engaged in deliberate indifference by denying him the use of a wheelchair beginning on July 31, 2020, which "caused him to experience elevated blood pressure, episodes of chest pain, and increased anxiety, and it was likely a trigger for the stroke he suffered on August 7, 2020." (Doc. 56 at 8-13.) But as discussed in Part I above, that claim is not properly part of this case. And because Plaintiff made no effort to produce evidence in support of his move-to-punitive-housing claim, Defendants are entitled to summary judgment on that claim under *Celotex*.

…

…

…

…

**IT IS ORDERED:**

1. The reference to the Magistrate Judge is **withdrawn** as to Defendants' motion for summary judgment (Doc. 53).

2. Defendants' motion for summary judgment (Doc. 53) is **granted**.

3. Counsel for Plaintiff and Centurion shall confer (among themselves and with their respective clients and witnesses) and then, by March 31, 2025, file a joint notice indicating an estimated length of trial. In the joint notice, the parties shall also propose at least three dates on which they and their witnesses will be available to begin trial in or after September 2025.

Dated this 17th day of March, 2025.

Dominic W. Lanza
United States District Judge